**IN THE UNITED STATES COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal No. 1:11-cr-48** |
| ) | The Honorable Leonie M. Brinkema |
| **STEVEN HAWKINS,** ) | |
| ) | Sentencing: July 8, 2011 |
| **Defendant.** ) | |

<u>**DEFENDANT'S POSITION ON SENTENCING**</u>

Pursuant to Title 18 U.S.C. § 3553(a), Federal Rule of Criminal Procedure 32, and

Section 6A1.3 of the United States Sentencing Guidelines, the Defendant, Steven Hawkins, by

and through counsel, hereby notifies the Court that he has received and reviewed the Presentence

Report (PSR) prepared in this case and has no objections.

Mr. Hawkins agrees that his offense level and criminal history category (Level 34,

Category VI) are correctly calculated pursuant to the "career offender" guideline, U.S.S.G. §

4B1.1(b), and the corresponding guideline range in this case is 262-327 months.  Mr. Hawkins

further states that absent the career offender guideline he would be at Level 25, Category IV, with

a corresponding guideline range of 84-105 months.  For the reasons set forth below, a total

sentence of 120 months (10 years, the mandatory minimum) is sufficient but not greater than

necessary to accomplish the purposes of sentencing in this case.

<u>**BACKGROUND AND INTRODUCTION**</u>

On April 15, 2011, Mr. Hawkins pled guilty to one count of Conspiracy to Distribute 100

Grams of More of Heroin after having been previously convicted of a felony drug offense in

violation of Title 21 U.S.C. §§ 841(a)(1) and 846.

1

Pursuant to the sentencing guidelines, Mr. Hawkins is considered a "career offender" as a result of his convictions for distribution of cocaine in 1991, when he was 20 years old, and again in 1994, when he was 23. Although a superficial examination of this criminal history may lead to the conclusion that Mr. Hawkins is, in fact, a career drug dealer, a closer look at Mr. Hawkins reveals a man who, now 40 years old, made serious mistakes in his youth but was on the right track to lead a law-abiding life after his 2007 release from prison. He was simply fell of that track.

When Mr. Hawkins emerged from incarceration in 2007, his initial re-adjustment to society was promising. He immediately got a job and held steady employment, primarily as a truck driver, and found that he could make a living as an honest, law-abiding citizen. In 2009, however, he was approached by undercover detectives who asked if he wanted to buy untaxed cigarettes. Untaxed meant cheap, and Mr. Hawkins agreed. Before long, the agents asked if Mr. Hawkins would sell them heroin, in return for the good deals they were giving him on the cigarettes. *See* Plea Hearing Transcript (Tr.), attached, at 25. Because Mr. Hawkins was not, at that point, involved in any drug distribution, he told the agents that he would have to "check into it" to "see if [he] could find it for them." Tr. at 25. Mr. Hawkins did not want to get involved with drug dealing again – that was his old life – but he also did not want to lose the cigarette deals as he had found that reselling the untaxed cigarettes helped make a little extra money. Reluctantly, but willingly, Mr. Hawkins found heroin on the streets, bought it in small quantities, repackaged it in larger quantities, and resold it to the undercover agents several times throughout 2009 and 2010. That Mr. Hawkins did not have a real drug 'source' and that he bought off the

streets is corroborated by the government's lab analysis showing that the drugs Mr. Hawkins sold were of very low, street-level, purity.

This is not to say that Mr. Hawkins was entrapped into dealing drugs – he was not. Nor is it to say that he did not knowingly and voluntarily engage in a conspiracy to distribute drugs – he did. It is merely to say that Mr. Hawkins did not leave prison in 2007 with the intent to return to a life of crime; he did not seek out drugs or drug dealers, he did not initiate drug distribution, and he did not become a part of any large scale drug ring. Accordingly, Mr. Hawkins is less culpable and less dangerous than a typical career drug offender, and thus a sentence of ten years imprisonment is appropriate.

## ARGUMENT

### I.      The Guideline Range is Advisory And Not Presumed Reasonable.

In two recent summary reversals, the Supreme Court stated in no uncertain terms that the guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon conviction of the statutory sentencing factors spelled out in 18 U.S.C. § 3553(a). *Nelson v. United States*, 129 S. Ct. 890 (2009); *Spears v. United States*, 129 S.Ct. 840 (2009). The Court's decisions in *Nelson* and *Spears* build upon its earlier decisions in *Kimbrough v. United States*, 128 S. Ct. 558 (2007), and *Gall v. United States*, 128 S. Ct. 586 (2007), establishing that the sentencing guidelines are simply an advisory tool to be considered alongside the other § 3553(a) statutory considerations.

"Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*. 129 S. Ct., at 892. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed*

3

reasonable." *Id.* (emphasis in original).  In other words, sentencing courts commit legal error by

using a sentencing guidelines range as a default to be imposed unless a basis exists to impose a

sentence outside that range.  *See also United States v. Johnson*, 553 F.3d 990, 996 (6th Cir. 2009)

("[I]t is clear that *Spears* applies with equal force to sentencing decisions under the new crack-

cocaine Guidelines and that district courts may categorically reject and vary from the new

Guidelines based on policy disagreements with those Guidelines.").

     While sentencing courts must continue to *consider* the sentencing guidelines, Congress

has *required* federal courts to impose the least amount of imprisonment necessary to accomplish

the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).  Those factors include (a) the

nature and circumstances of the offense and the history and characteristics of the defendant; (b)

the kinds of sentences available; (c) the advisory guidelines range; (d) the need to avoid

unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence

to reflect the following: the seriousness of the offense, promotion of respect for the law and just

punishment for the offense, provision of adequate deterrence, protection of the public from future

crimes and providing the defendant with needed educational or vocational training, medical care,

or other correctional treatment.  *See* 18 U.S.C. § 3553(a); *see also Kimbrough*, 128 S. Ct. at 570.

The sufficient-but-not-greater-than-necessary requirement is often referred to as the "parsimony

provision."  This requirement is not just another factor to be considered along with the others set

forth in section 3553(a) — it sets an independent limit upon the sentence.

     Upon consideration of those factors, a sentencing court may find that a particular case

falls outside the "heartland" contemplated by the guidelines, or that "the guidelines sentence

itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different

4

sentence regardless." *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007) (emphasis added).

While the Court must begin its analysis by correctly calculating the advisory sentencing range,

the sentencing court is then free in light of the other statutory sentencing factors to impose an

entirely different sentence. This is because, under *Rita,* a district court is free simply to disagree,

based on the § 3553(a) sentencing factors, with the U.S.S.G.'s "rough approximation" of the

appropriate sentence for any given case. *Id.*

**II. The Career Offender Guideline is Unsound In This Case and Therefore Should Be Accorded Less Weight Than Other Sentencing Factors.**

The application of the career offender enhancement drastically affects Mr. Hawkins'

advisory sentencing guideline range. The relevant guidelines in this case are:

|  | Adjusted Offense Level | Total Offense Level | Criminal History Category | Final Range (in months) |
|---|---|---|---|---|
| Career Offender | 28 | 34 | VI | 262-327 |
| Non-Career Offender | 28 | 25 | IV | 84-105 |

*See* PSR at Worksheet D. As evidenced by the table above, a designation of a person as a

"career offender" results "in some of the most severe penalties imposed under the guidelines."

*See* U.S.S.C., *Fifteen Years of Guidelines Sentencing*, at 133 (2004) (hereinafter "*Fifteen Years

Report*"), available at http://www.ussc.gov/Research/Research_Projects/Miscellaneous/

15_Year_Study/index.cfm.

Although designation of "career offender" is technically correct in this case, Mr. Hawkins

should not be sentenced in accord with that enhancement because (A) the career offender

guideline is categorically unsound because is not based on an empirical approach and creates

unwarranted sentencing disparities; (B) the career offender guideline is unsound as applied drug

trafficking career offenders like Mr. Hawkins because it does not achieve the purposes of

sentencing; and (C) the career offender guideline is unsound as applied to Mr. Hawkins because

it drastically overstates his criminal history.

> A.   The Career Offender Guideline is Categorically Unsound Because it is Not Based on an Empirical Approach and Creates Unwarranted Sentencing Disparities.

The Sentencing Commission readily acknowledges that it did not use an empirical

approach in developing the career offender guideline.  Instead, it took the same approach that it

did with the drug offense guidelines and keyed the offense levels to the statutory maximum

sentences.  *See* U.S.S.C., *Supplementary Report on the Initial Sentencing Guidelines and Policy

Statements* at 44 (1987), available at http://www.fd.org/pdf_lib/Supplementary%20Report.pdf

("much larger increases are provided for certain repeat offenders" under § 4B1.1 than under pre-

guidelines practice).  Courts have held that departing downward based on categorical policy

disagreement with the career offender guidelines is just as permissible as departing downward

based on a categorical policy disagreement with the crack/powder guidelines, which was

expressly upheld in *Kimbrough. See, e.g., United States v. Boardman*, 528 F. 3d 86, 86 (1st Cir.

2008).

Failing to use an empirical approach completely undermines the supposed role of the

Commission to be an independent expert body that makes informed recommendations based on

accurate research.  The career offender guideline originated with a statute, 28 U.S.C. § 994(h),

enacted as part of the Sentencing Reform Act (SRA), which itself was part of the Comprehensive

Crime Control Act of 1984.  Congress specifically chose to make § 994(h) a directive to the

Commission, not to the courts.  The Senate Report explained that it "was added to the bill . . . to

replace a provision . . . that would have mandated a sentencing judge to impose a sentence at or near the statutory maximum for repeat violent offenders and repeat drug offenders" because:

> The Committee believes that such a directive to the Sentencing Commission will be more effective; the guidelines development process can assure consistent and rational implementation of the Committee's view that substantial prison terms should be imposed on repeat violent offenders and repeat drug traffickers.

S. Rep. No. 98-225 at 175 (1983). In short, Congress specifically refrained from imposing mandatory sentences for career offenders, recognizing the Commission's unique ability to create Guidelines based on empirical data. Its overarching instructions to the Commission were to ensure that the guidelines met the purposes of sentencing set forth in § 3553(a)(2), to measure the effectiveness of the guidelines in meeting those purposes, to avoid unwarranted disparities, and to minimize prison overcrowding. 28 U.S.C. §§ 991(b), 994(f), 994(g). Congress expected that sentences under the guidelines "will not, on the average, be materially different from the actual times now spent in prison by similar offenders who have committed similar offenses," but that:

> [T]here will be some logical changes from historical patterns, as in the case of *serious violent crimes* or white collar offenses for which plainly inadequate sentences have been imposed in the past, and in the case of minor offenses for which generally inappropriate terms of imprisonment have been imposed in the past, but for the most part the average time served should be similar to that served today in like cases.

S. Rep. No. 98-225 at 116 (1983) (emphasis in original).

While Congress did not intend for the career offender provision to materially alter average sentences, the Commission's failure to engage in the guidelines development process has created a disturbing increase in average sentences since the career offender provision was implemented. For example, in 1987, prior to the enactment of the career offender guidelines, drug offenders were incarcerated for an average of 23.1 months. Supplementary Report at 69-70.

In 2007, drug offenders, including those sentenced as career offenders, were incarcerated for an average of 83.2 months.  U.S.S.C., 2007 Sourcebook of Federal Sentencing Statistics, Table 13. In addition, the number of defendants sentenced under the career offender guideline went from 1,279 in the year 2,000 to 2082 in the year 2005, which is a growth of 62.8% over five years. U.S.S.C., *Final Report on the Impact of United States v. Booker on Federal Sentencing*, at 139 (March 2003) (hereinafter "*Post-Booker Report*"), link to pdf available at http://www.ussc.gov/Publications/Reports_to_Congress/index.cfm.  The statistics make clear that current sentences are far harsher than they were before the guidelines and far harsher than they were ever meant to be.  Thus, the Court must recognize that the guideline itself is flawed, and it would be unreasonable to impose a sentence within the range produced by a guideline based on improper methodology rather than reliable data.

       B.      <u>The Career Offender Guideline is Unsound as Applied to Drug Trafficking Offenders Because it Does Not Achieve the Purposes of Sentencing.</u>

The Sentencing Commission has acknowledged that the career offender provision sits on unstable ground as applied to drug traffickers.  *Fifteen Year Report*, at 134, ("The question for policymakers is whether the career offender guideline, especially as it applies to repeat drug traffickers, clearly promotes an important purpose of sentencing.").   Mr. Hawkins received the designation of career offender based on two prior drug convictions.  In the present offense, Mr. Hawkins was a low level dealer who merely bought drugs on the street and resold them to undercover agents.

The Commission explained that "[u]nlike repeat violent offenders, whose incapacitation may protect the public from addition crimes by the offender, criminologists and law enforcement

officials testifying before the Commission have noted that retail-level drug traffickers are readily replaced by new drug sellers so long as the demand for a drug remains high." *Id.* Therefore, "[i]ncapacitating a low-level drug seller prevents little, if any, drug selling; the crime is simply committed by someone else." *Id.*; *see also Report of the Global Commission on Drug Policy*, June, 2011, available at: www.globalcommissionondrugs.org/Report (study results concluding that "[t]he global war on drugs has failed" and finding that increasing arrests does not help to improve the "health and welfare of mankind."). In addition, and "[m]ost importantly," a "preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates are much lower than other offenders assigned to criminal history category VI." *Fifteen Year Report,* at 134.

Because the guidelines incorporating the career offender enhancement fail to meet several significant purposes of sentencing with respect to drug trafficking career offenders, the guidelines should carry less weight for drug trafficking career offenders as compared to other types of career offenders. And indeed, drug trafficking accounts for "74.3 percent of all downward departures and 73.1 percent of other below-range sentences among the career offender cases." *Post-Booker Report*, at 138. In other words, courts routinely award the guidelines less weight in sentencing drug trafficking career offenders compared to other types of career offender cases, such as firearms and robbery, and therefore the Court should similarly give them less weight in this case.

    (C)    <ins>The Career Offender Guideline is Unsound as Applied to Mr. Hawkins Because it Drastically Overstates His Criminal History.</ins>

The career offender guideline overstates Mr. Hawkins criminal history because without the enhancement, the guidelines would recommend a sentence *1 to 3 years lower* than the 10 year

mandatory minimum in this case. The application of the career offender provision puts the low

end of Mr. Hawkins' guideline range 142 months higher – over 11 *years* higher – than it would

be without the enhancement.[1] Similarly, the enhancement makes the high end guideline 207

months higher, or over 17 years, higher. The magnitude of this jump alone illustrates how

extreme applying the career offender provision would be in this case.

Several courts since *Gall,* facing significantly less compelling circumstances than these,

have found that the drastic effects of the career offender guideline simply do not reflect sound

sentencing policy. In *United States v. Martin,* 520 F. 3d 87, 88-96 (1st Cir. 2008), for example,

the Court affirmed a 144-month sentence in a case where the correctly-calculated sentencing

guidelines called for a sentence of 262 to 327 months pursuant to the career offender guideline.

The district court regarded the career offender guideline as an improper basis for determining the

appropriate sentence on the facts before it, and instead imposed a variant sentence of 144 months,

near the middle of the otherwise-applicable (non-career offender) guideline range of 130 to162

months. 520 F.3d at 88, 98. The Court of Appeals rejected the government's argument that the

district court had improperly disregarded the career-offender guideline, holding that:

> The Supreme Court's recent decision in *Kimbrough,* 128 S.Ct. at 574-75, opened
> the door for a sentencing court to deviate from the guidelines in an individual case
> even though that deviation seemingly contravenes a broad policy pronouncement
> of the Sentencing Commission. Here the district court grounded the defendant's
> sentence in case-specific considerations, which is the accepted practice in the
> post-*Gall* world.

520 F.3d at 96.

---

[1] Although the guideline range without the career offender enhancement is 84-105, the 120
month mandatory minimum in this case essentially creates an adjusted guideline of simply 120
months because it is the minimum and greater than the otherwise 105 high end.

Also, in *United States v. Sanchez,* 517 F.3d 651 (2d Cir. 2008), the Second Circuit remanded for consideration of a lower sentence in the case of a defendant who had been subject to a career-offender sentencing range of 262 to 327 months, and had received a 188-month sentence prior to *Gall.* Specifically, because the district court believed when it sentenced the defendant that it could not legally impose a "sentence at, or near, the statutory minimum," the court of appeals remanded for re-sentencing in light of *Gall.* 517 F.3d at 665-66. The court reasoned that neither the sentencing guidelines nor § 994(h) prohibited a sentencing judge, even in a career offender case, from imposing a variant sentence at the mandatory minimum, and that the defendant was therefore entitled to have the sentencing judge consider whether the mandatory minimum sentence was sufficient to accomplish the purposes of sentencing. *Id.*

Here, such a drastic increase in Mr. Hawkins' guidelines is based only on two prior convictions, both almost two decades ago, when Mr. Hawkins was in his twenties. *See* PSR Worksheet C. Because both convictions happen to be drug convictions for which Mr. Hawkins served more than a year, they qualify Mr. Hawkins for the career offender enhancement. But, taken for what they are – two prior drug convictions, twenty years ago, for which Mr. Hawkins has been punished – they would only qualify Mr. Hawkins for a criminal history category IV under the standard guidelines. In addition, the actual offense in this case, taken for what *it* is, would only be an offense level 25 (with acceptance) under the standard guidelines. Since Mr. Hawkins' *actual* history combined with his *actual* offense in this case would warrant a sentence of one to three years less than the mandatory minimum in this case, the mandatory minimum is certainly sufficient and any higher sentence would be significantly greater than necessary to accomplish the purposes of sentencing.

11

### III.   A Sentence of Ten Years Imprisonment Satisfies the Purposes of Sentencing Under 18 U.S.C. § 3553(a).

Because the career offender guidelines should be accorded less weight, as discussed above, the Court should rely primarily on the other § 3553(a) factors at play in this case.  Here, the § 3553(a) factors weigh in favor of the lowest possible sentence in this case: 10 years.

### A.   The History and Characteristics of the Defendant.

Nothing about Mr. Hawkins' life has been easy.  Mr. Hawkins grew up in a destitute neighborhood in Charles County, Maryland.  PSR ¶ 73. He never had a stable household; although his father and mother had seven children together, his father was married to another woman and had another family. PSR ¶ 69. Mr. Hawkins has only ever seen his father a couple of dozen times in his life.  Thus, Mr. Hawkins' early years were spent living with his mother and six siblings in his grandmother's house. PSR ¶ 70.  When his grandmother died, they moved to a friend's basement for several years, which they shared with another family.  PSR ¶ 70.  Finally, when Mr. Hawkins was in the fourth or fifth grade, they moved into their own place, on housing assistance.  PSR ¶ 70.

As Mr. Hawkins' girlfriend Machelle Johnson put it, "Steve came from very humble beginnings," which "forced him to use any means to survive," and "these overwhelming efforts to succeed in life forced him into uncompromising positions...."  *See* Letter from Machelle Johnson, attached at Tab A.[2]  Some of those uncompromising positions included exposing Mr. Hawkins to drugs and crime at a young age.  Mr. Hawkins first tried marijuana when he was 16, crack cocaine when he was 19, and he had his first drink at age 16 or 17.  PSR ¶ 79, 80, 81. At

---

[2]Character letters from family and friends in Mr. Hawkins' support are attached at Tab A. At Tab B are letters and a certificate related to his present incarceration.

such a vulnerable and impressionable stage of his life, Mr. Hawkins immediately became an abusive user of all three.

As an abusive user who knew no better way of life – he had few role models – Mr. Hawkins started selling drugs as a way to make money to survive.  He sold drugs because that's what people in his neighborhood did; everyone used drugs, and everyone sold drugs.  When he was 20, the police raided his street.  Along with a others arrested in the raid, Mr. Hawkins was convicted of possession and distribution, and he went to jail for two years.  PSR ¶ 52, 53.  When he was released, he moved back to his old neighborhood and immediately fell back into his old ways with his old friends.  Though no excuse, Mr. Hawkins began selling drugs again because it was simply the only life he knew.  At age 23, Mr. Hawkins was arrested again for dealing cocaine and served 14 years.[3]  PSR ¶ 54.

A hard life and tough circumstances does not excuse Mr. Hawkins, or anyone else, from dealing drugs. It does, however, put into context how and why he ended up doing what he did. Although Mr. Hawkins is completely responsible for his actions and must suffer the consequences, he is also in a sense a victim of his upbringing and the life that surrounded him.  It is therefore important to understand that the two predicate offenses that qualify Mr. Hawkins as a career offender both occurred in his early twenties, right when he was coming of age in the world of drugs and crime he inhabited.  While Mr. Hawkins fully accepts responsibility for his past and

---

[3]Mr. Hawkins was originally sentenced to 25 years for his conviction in 1994. PSR ¶ 54. After years of diligent fighting, however, the Court of Special Appeals found the sentence illegal and vacated it in 2007.  On remand, Mr. Hawkins was sentenced to 20 years, with all but 14 (the 14 he already served) suspended. PSR ¶ 54.

current offenses, it would be unduly harsh to double or triple his sentence here on the basis of those two youthful mistakes when considered in context.

It is also important to consider how Mr. Hawkins has grown since those crimes in his youth.  Mr. Hawkins has strived to be a better man, both while in prison and since his release. As evident by the plethora of character letters in support of Mr. Hawkins, (attached to this memorandum at Tab A), Mr. Hawkins was well loved in his community since his release. He is described as a family man with a "bright smile that lightens up any room." *See* Letter from Doris A. Hawkins, (Mr. Hawkins' aunt).  Mr. Hawkins is the kind of man you just need to "call and he will be there." *See* Letter from Sharon Hawkins, (sister).  Understanding how hard it is to grow up without a father, Mr. Hawkins has even served as a mentor, since his release, to a good friend's 14 year old son who is now an honor student and junior ROTC.  *See* Letter from Malanie Speight,(good friend).

Mr. Hawkins is also focused on his own immediate family.  He has a daughter, now 17, for whom he has "only wanted the best."  *See* Letter from Doris J. White, attached (mother of Machelle Johnson, Mr. Hawkins' girlfriend).  Although his daughter's mother would not let his daughter visit him in prison, Mr. Hawkins did his best to support her while incarcerated.  Mr. Hawkins worked in the prison print shop and sent $100 to $150 a month home for his daughter, even though he had no legal support obligations but because it was the right thing to do.  Since his release in 2007 until his arrest here, Mr. Hawkins saw his daughter nearly every day and has formed a close relationship with her; he is desperate to make up for the time he has lost.  Mr. Hawkins has plans to continue to become a good father and also plans to marry his girlfriend Machelle and become a family.

In this light, it is important to consider that Mr. Hawkins is not a hardened criminal who needs a significant sentence.  Understanding how hard he has worked hard since his release to grow and mature as a person illustrates how the offense here was more of a lapse – albeit a serious and irresponsible one – than it is another step of a career criminal.

B.    The Nature and Circumstances of the Offense.

Mr. Hawkins was once a neighborhood drug dealer.  He'd had a tough life, became addicted to drugs at a young age, and fell into the only lifestyle he knew – dealing drugs.  He went to jail for fourteen years.  When he was released, he had made up his mind to be through with crime and drugs.  And he *had* successfully shaken his past until he was approached by undercover officers and asked to sell drugs again.

When Mr. Hawkins was in prison for 14 years from1994 until 2007, he made the decision to turn his life around.  Mr. Hawkins regularly attended Narcotics Anonymous meetings and successfully completed a drug counseling program while incarcerated. PSR ¶ 82, 84. At his release in 2007, Mr. Hawkins was finally clean and ready to start a new life.  PSR ¶ 81, 83.  With his love of engineering and driving, Mr. Hawkins earned his commercial driver's license and began a career as a truck driver.  *See* Letter from Machelle Johnson, attached.  He worked for several companies between 2007 and 2010 driving various kinds of commercial trucks (including street sweepers, dump trucks, petroleum trucks, and regular freight), and made as much as $15.50 an hour.  PSR ¶ 89-91.  Finally, his life was going somewhere: he was making good money, seeing his daughter regularly, and enjoying the freedom he would missed for so long.

In 2009, however, he got greedy.  An undercover officer approached him at a 7-11 and asked if he wanted to buy untaxed cigarettes.  PSR ¶ 13.  Mr. Hawkins, knowing the contraband

cigarettes were cheaper, bought a carton, and they agreed to stay in touch.  PSR ¶ 13.  After

another couple of cigarette deals, (Mr. Hawkins had found that he could resell the contraband

cigarettes for a small profit), the undercover agents asked Mr. Hawkins if he could sell them

heroin.  PSR ¶ 15.  Since Mr. Hawkins was no longer involved in drug dealing, Mr. Hawkins told

him he would "have to find out and see if [he] could find it for them." T at 25.

Mr. Hawkins was reluctant – he had been down that path before and he knew it led to

prison.  But the undercover agents called and texted repeatedly over several months, and

eventually Mr. Hawkins agreed. He did not give in because he was coerced or entrapped, but

rather because he was afraid they would stop selling him the inexpensive cigarettes if he did not

buy them heroin, and he did not want to lose the cigarette deals.

Mr. Hawkins did not have access to heroin or any heroin dealers, so he contacted Mr.

Dixon who "pretty much [told Mr. Hawkins] where to get it at."  T at 29.  At Dixon's advice, Mr.

Hawkins went out onto the streets, primarily in Baltimore, and bought heroin in small quantities

from small level street dealers.  He knew nothing about them: their names, who they worked for,

or where they got their drugs.  Because the undercover agents asked for heroin in moderate

quantities, for each deal, Mr. Hawkins had to go to many small street dealers to accumulate

enough quantity, which he would then repackage together to resell to the agents.  Mr. Hawkins

made very little to no profit on the heroin sales; all he wanted was the cigarettes.  Mr. Hawkins

should be punished in proportion to his level of culpability.

There is no question that Mr. Hawkins knowingly and willing found the heroin for the

agents.  He sold them drugs intentionally and freely because he wanted the couple of extra dollars

this newly discovered contraband cigarette business was bringing him.  He knows now what an

irresponsible mistake it was to agree to participate– he knows he should have said no, he should have walked away.  Mr. Hawkins is simply less culpable than a cursory review of the facts reveals.  He sold drugs, but he is not truly a drug dealer or a career criminal for whom decades in prison is necessary or appropriate.  Any sentence over 10 years would be greater than necessary to reflect Mr. Hawkins' level of culpability.

      C.     The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants.

The need to avoid sentencing disparities also weighs in favor of a 10 year sentence.  On a general level, as discussed above at Section II (B) and (C), the application of the career offender provision here treats Mr. Hawkins the same as a murderer, armed robber, or leader of a drug cartel.  Though serious, the offence in this case does not rise to any of those levels.  Mr. Hawkins has never been violent and he has never been a part of a large scale operation.  Accordingly, it would be unwarranted to treat him as such and a sentence within or even near the guidelines in this case would do just that.

With specific regard to this case, 10 years is further appropriate in light of Mr. Dixon's sentence.  Mr. Hawkins' co-conspirator in this case, Mr. Dixon, was sentenced to 60 months and five years of supervised release.  Mr. Dixon has been described as Mr. Hawkins' supplier. Although the term "supplier" may technically be accurate, in reality, neither Mr. Hawkins nor Mr. Dixon were part of any larger drug conspiracy where one would have the title of "supplier." "[A]ctually what would happen" was Mr. Hawkins "would call [Mr. Dixon] and tell him that people were looking for heroin, and he would actually just pretty much tell [Mr. Hawkins] where to get it at," and then Mr. Dixon would accompany Mr. Hawkins to pick up the drugs.  Tr. at 29.

17

As discussed above, Mr. Hawkins' and Mr. Dixon's conspiracy was a very low caliber, unsophisticated operation designed merely to acquire the drugs the agents were requesting.

Nonetheless, Mr. Dixon was present at many of the drug transactions in this case.  *See* Dixon Statement of Facts, 1:11cr-00048, dkt. entry 27 (Dixon SOF), at 2-3.  Mr. Dixon presented to the undercover officers that he and Mr. Hawkins were a team.  *See id.*  Mr. Dixon collected money in some of those transactions.  *See id.*  Mr. Dixon bought contraband cigarettes alongside Mr. Hawkins.  *See id.* at 3-4.  And Mr. Dixon literally showed Mr. Hawkins where to purchase the heroin every time.

Furthermore, Mr. Dixon's criminal record is not any less severe than Mr. Hawkins'.  In fact, Mr. Dixon's record can be considered worse than Mr. Hawkins' because where Mr. Hawkins has two prior felonies, they were both for non-violent street drug deals.  Mr. Dixon, however, was convicted in 1992 of two counts of robbery with a deadly weapon and one count of using a handgun during the commission of a felony. *See* Gov't Position on Sentencing, 1:11cr-00048, dkt. entry 44.  Had Mr. Dixon been sentenced separately for each of the robberies in 1992, he, too, would qualify as a career offender.  Therefore, the fact that both Mr. Hawkins and Mr. Dixon have committed two prior crimes combined with the fact that Mr. Dixon's crimes were violent robberies and the Court *nontheless* sentenced him to five years evidences that a 10 year sentence for Mr. Hawkins is the only appropriate sentence here.  Any sentence greater would create an unwarranted disparity between the two co-conspirators.

      D.     The Need for the Sentence Imposed to Provide Just Punishment, to Adequately Deter, and to Protect the Public.

Mr. Hawkins is not asking for a light sentence in this case, he's asking for a just sentence of 10 years.  Ten years is a full quarter of Mr. Hawkins' life to date.  Though 10 years *is* well below the correctly calculated guidelines in this case, it is still a significant term for a non-violent drug dealer who is not part of any drug ring, cartel, or major conspiracy.  Mr. Hawkins' crime was serious, but it was not violent, he was not a kingpin, and he did not directly harm anyone or cause financial loss.

In addition, 10 years is sufficient to deter Mr. Hawkins.  With a full 10 year sentence, Mr. Hawkins will be 50 years old when he is released.  Mr. Hawkins is aware that men in his family tend to die young.  He is determined not to waste what he believes will be the last decade or so of his life with more crime.

Finally, as discussed above at Section II (B), the need to protect the public is not a justification for giving a low level street drug distributor like Mr. Hawkins a longer term of imprisonment.  Low level dealers are simply replaced by others and therefore, keeping individual people off the streets has no effect.  *See Fifteen Year Report*, at 134.  Accordingly, a sentence of 10 years is sufficient to satisfy the purposes of providing a just sentence, deterring, and protecting the public.

## **CONCLUSION**

The guideline range in this case significantly overstates Mr. Hawkins' culpability.  First, it more than doubles the recommended punishment simply on the basis of two drug convictions from Mr. Hawkins' twenties that were spurred by his unhealthy and drug-ridden childhood.

Second, the guideline range would punish Mr. Hawkins to the same degree as a violent killer,

rapist, or drug kingpin.  A sentence of 21 to 27 years is extreme for a man who did not seek out

crime but merely agreed to sell drugs.  Incarceration for 10 years, however, adequately represents

Mr. Hawkins' level of culpability and his actual criminal history, and accordingly, Mr. Hawkins

respectfully requests a sentence of 10 years.


Respectfully submitted,
Steven L. Hawkins



                    /s/
_____
W. Todd Watson, Esquire
Attorney for Defendant
Va. Bar No. 38527
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703)600-0878 (telephone)
(703)600-0880 (facsimile)
Todd_watson@fd.org

Kathryn J. Mims, Esquire
Attorney for Defendant
Va. Bar No. 81486
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA   22314
(703)600-0869 (telephone)
(703)600-0880 (facsimile)
Kathryn_mims@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of July, 2011, I will electronically file the foregoing with the Clerk of court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> AUSA Philip Sam Kaplan, Esquire
> United States Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, VA   22314

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the forgoing pleading will be delivered to Chambers within one business day of the electronic filing.

_____/s/_____

W. Todd Watson, Esquire
Attorney for Defendant
Va. Bar No. 38527
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703)600-0878 (telephone)
(703)600-0880 (facsimile)
Todd_watson@fd.org
